IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | Case No.: 23-11090<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930]<br><br>DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1) |

## NOTICE OF REMOVAL

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Karen McManus:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions Tufts Medical Center, Inc. ("Tufts MC") has taken in connection with pursuing that directive. Tufts MC therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pages 9 and 10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, Tufts MC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

**NATURE OF THE CASE**

1. Tufts MC is a Massachusetts non-profit charitable corporation that offers a full range of medical services and operates in Boston, Massachusetts and the surrounding area.

2. On April 19, 2023, Plaintiff Karen McManus filed a complaint against Tufts MC, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2384CV00930.

3. Plaintiff served Tufts MC with the Complaint, effective on April 26, 2023.

4. Plaintiff's Complaint purports to challenge Tufts MC's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See generally* Complaint ("Compl."); *id.* at ¶¶ 108-15.

5. Tufts MC operates the Tufts MC public website, found at https://www.Tufts MCmedicalcenter.org/, that provides information to the public about Tufts MC's health care services and contains a link to access its secure patient portal and electronic medical records contained within the portal. *Id.* at ¶¶ 13-16.

6. Plaintiff alleges she is a Tufts MC patient and that she uses Tufts MC's website to "(i) obtain information about [Tufts MC] doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal." *Id.* at ¶ 10.

7. Tufts MC offers inpatient and outpatient care to residents near Boston and other surrounding communities, including providing healthcare across a number of various specialties. *Id.* at ¶ 13. Among other alleged functions, the Tufts MC website provides information about doctors and allows healthcare consumers to access private medical information online through the myTuftsMed Patient Portal. *Id.* at ¶¶ 14-15.

2

8. Plaintiff alleges that the Facebook[1] or Meta Pixel, allegedly used on the Tufts MC website transmitted private health information to Facebook. *Id.* at ¶¶ 42, 72-73.[2]

9. Plaintiff also alleges that Google Analytics, allegedly used on the Tufts MC website, "collect[s] the IP addresses of Website users and track their activity on the Website, including communications about private medical information." *Id.* at ¶¶ 40, 43.

10. Plaintiff contends that Tufts MC intercepted and transmitted communications between healthcare consumers and Tufts MC without the consumer's knowledge and consent. *Id.* at ¶ 96.

11. Plaintiff does not assert that Tufts MC discloses names, social security numbers, diagnoses, birthdates, or comparable information to the third parties.

## BASIS FOR REMOVAL

12. Tufts MC removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

13. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants can remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged

---

[1] Facebook rebranded itself as Meta in 2021.
[2] The Meta Pixel, however, was not used on the myTuftsMed Patient Portal.

3

conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.,* 25 F.4th 30, 34 (1st Cir. 2022); *see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[3]

14. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid program (like Tufts MC) to offer patients online access to their records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

15. Tufts MC has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

---

[3] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given this requirement a broad reading and held that no causal link is required." *Moore v. Elec. Boat Corp.,* 25 F.4th 30, 35 (1st Cir. 2022).

### *The Meaningful Use Program*

<u>*President Bush Establishes the Position of National Health Information Technology Coordinator*</u>

16. In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("ONC"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

17. Through the Executive Order, President Bush further ordered the ONC to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

<u>*The ONC Makes Access to Online Health Care Records a National Priority*</u>

18. From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

19. But years later, when the percentage of Americans accessing their health information online remained low, the ONC reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." (*Id.* (emphasis added).) *See also, e.g.,* Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of

physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

*Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

20. In 2009, Congress codified the ONC in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009).[4] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

21. As with President Bush's Executive Order, Congress tasked the ONC with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

22. Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health*

---

[4] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

*Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

23. As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

*The ONC Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

24. The following year, , the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, 44321.

25. One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability *to view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will

7

attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

26. The regulations required health care providers to attest to the ONC and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

*The ONC Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*

27. To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

28. The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id*. Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3.

Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use.*" *Id*.

29.  The ONC subsequently issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

30.  The ONC has also specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly"; "how a patient portal helps achieve meaningful use requirements"; and how a provider can "actively promote and facilitate portal use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at:

https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

31.  The ONC has also published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to

9

help digitize health information and healthcare." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

32. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

### *Tufts MC Makes a Patient Portal Available Online to Tufts MC Patients in Direct Furtherance of this Federal Mission*

33. The myTuftsMed Patient Portal is a tool created and promoted by Tufts MC for its patients' use as a direct result of the federal initiative to make health care records available to patients online. Since establishing the patient portal, Tufts MC has continually met the Meaningful Use criteria, and has thus received incentive payments from the federal government. If necessary, Tufts MC is prepared to submit a declaration supporting its participation in the Meaningful Use program.

### *Tufts MC Is A "Person" Within § 1442(a)(1)*

34. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

35. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

36. Tufts MC is a non-profit charitable corporation with its main campus in Massachusetts, Compl. ¶ 11, and since the federal officer statute is to be broadly construed, Tufts MC qualifies as a person under that statute.[5]

### *Tufts MC is Effectively Acting Under a Federal Officer*

37. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

38. Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising Tufts MC's actions in the Meaningful Use

---

[5] Although in other contexts, Tufts may not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

11

program in order to meet the federal government's national priority of interoperable health information technology.

39. First, Tufts MC (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

40. Second, in the absence of Tufts MC's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

41. Third, the government has specified how to best enhance patient engagement, including through patient portals. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

42. Finally, the government has created an office dedicated to this endeavor and has closely monitored the work of private entities (like Tufts MC). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Tufts MC and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

43. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL

4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

44.  In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of plaintiffs' personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, *id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide. *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in UPMC, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id*.

13

*Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

45. Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, the "for or relating to" requirement under § 1442(a)(1) is liberally construed and constitutes a lower burden than even a "causal connection." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (overturning a district court that imposed a "strict causal connection" though "§ 1442(a)(1) requires [] only that the charged conduct *relate to* an act under color of federal office). Moreover, any single claim is independently sufficient to satisfy the "for or relating to" requirement under § 1442(a)(1). *Moore*, 25 F.4th at 35 (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)). In fact,

46. Plaintiff's Complaint directly challenges Tufts MC's website analytics practices, which help drive patients to Tufts MC's websites.

47. Plaintiff's Complaint also generally targets Tufts MC's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

48. The entire point of using the third-party services is to direct traffic to, and increase engagement with, Tufts MC websites as it is designed to communicate with healthcare consumers. *See, e.g.*, Compl. ¶ 15. Indeed, Plaintiff acknowledges that the Meta Pixel and Google Analytics are analytics tools "designed to track a user's actions on the website." *Id*. at ¶ 39.

*Tufts MC Raises Colorable Federal Defenses to Plaintiff's Claims*

49. The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar, merely requiring that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v.*

*Cal.,* 489 U.S. 121, 129-30 (1989); *Moore*, 25 F.4th at 37 (a "colorable federal defense" need not be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations omitted); *accord. Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

50. Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfies this requirement. In response to Plaintiff's repeated claims that "private health information" and health related communications were disclosed, Compl. ¶ 42, Tufts MC will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). The Northern District of California has already held in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

51. Because each of the requirements of the removal statute are satisfied, removal to this Court is proper.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

52. Tufts MC likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

15

53. Tufts MC is filing this Notice of Removal within twenty (20) days of its receipt of the Complaint by "service," which is well within the thirty (30) day deadline under 28 U.S.C. § 1446.

54. Tufts MC files this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

55. Tufts MC has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Complaint.

56. Upon filing this notice, Tufts MC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## **CONCLUSION**

As set forth above, Plaintiff's Complaint directly challenges practices and procedures Tufts MC has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE**, Tufts MC respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

[SIGNATURE BLOCK FOLLOWS ON THE NEXT PAGE]

Dated: May 16, 2023										Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

    I hereby certify that, on May 16, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*


                                            */s/ James H. Rollinson*
                                            *One of the attorneys for defendant*